IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRYSTAL VORN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 12-6930 |
| MEGAN BRENNAN [1] | : | |

## MEMORANDUM

**SURRICK, J.**                                                           **MAY 5, 2020**

      Presently before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 25.)
Plaintiff Crystal Vorn filed this lawsuit against the United States Postmaster General seeking
redress for alleged sex discrimination and retaliatory conduct by the United States Postal Service,
in violation of Title VII.  The genesis of Vorn's grievances is a shortage of USPS supervisors,
which often made it difficult for postmasters like her to find supervisory coverage for their post
offices.  As a result, Vorn and other postmasters were forced to work long hours and weekends,
often with less time off than they would have liked.  The question in this lawsuit is whether
Vorn's plight was brought about by discrimination.  Viewing the record in the light most
favorable to Vorn, we conclude that she has failed to establish a *prima facie* case of
discrimination or retaliation.  Although the staffing situation at the USPS may have given Vorn
legitimate grounds for dissatisfaction, there is no indication that she was discriminated against
because of her sex.  There is also no indication that she suffered retaliation as a result of filing a
complaint with the EEOC alleging sex discrimination.  Accordingly, her Title VII claims must be
dismissed.

---

[1] Megan Brennan became Postmaster General on February 1, 2015.  Accordingly, we
have amended the caption to name her as Defendant.  *See* Fed. R. Civ. P. 25(d).

## I.      BACKGROUND

Vorn joined the USPS in February 1985, as a letter carrier.  (April 17, 2018 Dep. of Plaintiff ("Plaintiff Dep.") 15, Def. Ex. 1.)  After serving as a letter carrier for seven years, she sought to become a supervisor.  Initially, she became an acting supervisor, otherwise known as a "204-B" supervisor.  (Plaintiff Dep. 16; April 11, 2018 Dep. of Dorita Maher ("Maher Dep.") 40-41, Def. Ex. 2/Pl. Ex. D.)[2]  In 1993, she became a formal supervisor, otherwise known as a "Form 50" supervisor.  (Plaintiff Dep. 18.)  She then became acting postmaster of the Oreland Post Office and, in October 2007, she became postmaster of the Gladwyne Post Office.  (*Id*. at 27, 31, 57.)  As postmaster of Gladwyne, Vorn reported to Anthony Faella, the manager of post office operations for the Philadelphia Metropolitan District.  (Plaintiff Dep. 59; March 12, 2018 Dep. of Anthony Faella ("Faella Dep.") 74, Def. Exhibit 4/Pl. Ex. A.)

The USPS assigns a classification level to each post office, based on the amount of business it does and the number employees who work there.  (Maher Dep. 25-26.)  Gladwyne was a small "level 18" post office.  (Plaintiff Dep. 48.)  Before Vorn accepted the position at Gladwyne, she learned that the post office did not have any other permanent Form 50 supervisors and, instead, relied on 204-B supervisors.  (*Id*. at 49.)  Other level 18 post offices in the Philadelphia Metropolitan District also did not have permanent supervisors assigned to them, and Vorn was aware of that fact.  (*Id*. at 69; Faella Dep. 20-21, 84.)

Under USPS policy, Vorn was a salaried employee, subject to the following terms of employment:

> A full-time postmaster is scheduled to work a 40-hour workweek.  Normally, this regular work schedule is set at 8 hours a day and 5 days a week, Monday through Friday.  When a nonexempt postmaster is required to work on the sixth day because relief is not available, premium pay at 150 percent of the postmaster's basic salary

---

[2]      As of April 2018, Maher was an acting human resources manager for the South Jersey District.  She used to be a manager of post office operations in Philadelphia.  (Maher Dep. 7-13.)

is paid for this time.  Equivalent time off from work is not authorized to avoid the
payment of this premium.  Thus, either nonbargaining rescheduling premium or the
better of postal or FLSA overtime, as appropriate, is paid.

(Def. Ex. 8; Maher Dep. 38-39; Pl. Ex. 35.)  Under Faella's management, as long as postmasters

found coverage, they could take time off.  (Faella Dep. 82-83.)  Vorn admits, however, that the

postmaster would have to find that coverage herself.  (Plaintiff Dep. 172, 175.)  On some

occasions, Faella would attempt to help Vorn find coverage, even though it was not his

responsibility to do so.  (Faella Dep. 85-86; Pl. Dep. 176.)  On other occasions, Faella would

deny Vorn's requests for leave if she had not secured coverage or identified the person covering

for her.  (Pl. Ex. 5; Faella Dep. 47-55.)

Since the 1990s, the USPS has shrunk in size, resulting in fewer employees and

supervisors.  (Maher Dep. 34-36.)  Beginning in 2005, to address the shortage of supervisors in

the Philadelphia Metropolitan District, the USPS created a strategy pursuant to which

supervisors from various designated offices would provide coverage for the postmasters of the

level 18 offices when those postmasters were off or on leave.  (Pl. Ex. 1.) Under this system, the

postmaster who needed coverage would contact the other offices for assistance.  (Plaintiff Dep.

169.)  It was not the operations managers' responsibility to find coverage.  It was the

responsibility of the level 18 postmaster who needed the coverage.  (Faella Dep. 77; Maher Dep.

50.)

By 2009, after Faella had become operations manager, this strategy was no longer acted

on because the larger, designated offices no longer had as many staff.  (Faella Dep. 76-78.)  Vorn

acknowledged that the strategy was an arrangement enforced under previous operations

managers, before Faella became a manager.  (Plaintiff Dep. 169-72.)  Regardless, under Faella's

management, multiple level 18 offices still had no permanent supervisor, and postmasters still

needed to find their own coverage when they were off or on leave.  (Faella Dep. 74-75, 84.)

Several offices, including Vorn's, sometimes had difficulty finding supervisory coverage.

(Plaintiff Dep. 100-03, 109.)  Because of staffing issues, several postmasters also had to work

more than 40 hours per week and work weekends.  (Maher Dep. 42-43; Pl. Ex. 12.)  As one

overworked postmaster described it, "That's the job. You're salar[ied]; that's what you get paid

to do."  (March 13, 2018 Dep. of Joseph Nugent ("Nugent Dep.") 41, Def. Ex. 3/Pl. Ex. F.)

Vorn knew that she was not the only postmaster who had difficulty finding coverage.  (Plaintiff

Dep. 122.)

　　　As postmaster of Gladwyne, Vorn was responsible for street observation, which entailed

her supervising carriers as they delivered mail.  (Plaintiff Dep. 257; Maher Dep. 26-27.)  When

doing street observation, Vorn could either use her own personal vehicle and submit expenses for

reimbursement, use another postal truck, if available, or ride along in a jump seat with a postal

carrier.  (Faella Dep. 90-91; Maher Dep. 52-53.)  Vorn did not want to use her own personal

vehicle.  (Pl. Dep. 270.)  According to Vorn, the jump seats were not an option because they

were installed in such a way that she could not observe what was going on outside.  (Pl. Br. 6,

ECF No. 26; Pl. Ex. 27; Decl. of Crystal Vorn ("Vorn Decl.") ¶ 17, ECF No. 26-2.)  On at least

one occasion, Vorn requested a government-issued Ford Focus in which to conduct street

observation, but none was available.  (Plaintiff Dep. 269-70; Pl. Exs. 14-15.)

　　　As of 2011, Vorn had failed to carry out her street supervision duties multiple times.  (Pl.

Exs. 14-15; Def. Exs. 16-18.)  When Faella asked why, she explained that she was too busy or

that she needed a postal vehicle.  (Def. Ex. 18.)  Faella explained that street observation was part

of her duties and that no postal vehicles were available.  He also suggested that she make inquiry

of neighboring offices as to whether they had any vehicles available for her to use.  (Pl. Exs. 14-

15.)  Faella warned her that if the problem continued, she would be subject to discipline.  (Def. Exs. 17, 19; Pl. Ex. 7.)  At one point, Faella asked management to reassign Vorn to another position because of her failure to comply with her street observation responsibilities.  (Pl. Ex. 14.)  However, she was never reassigned.  (Pl. Dep. 275-76.)

On January 13, 2010, Vorn contacted an EEO counselor.  (Def. Ex. 20.)  On January 25, 2010, she filed her first EEO complaint, alleging sex discrimination.  (Pl. Ex. 36.)  In this complaint, she alleged that management failed to provide her coverage for time off, which resulted in her working long hours and weekends and not being able to use her annual leave.  (*Id*.)  With regard to her charge of discrimination, Vorn wrote "I work 10 hours a day and am forced to work every Saturday.  No male Postmasters are subjected to working these hours and weekends."  (*Id*.)  She also demanded to be compensated.  (*Id*.)

On February 9, 2011, Vorn filed a second EEO complaint alleging sex discrimination and retaliation.  (Pl. Ex. 32.)  She alleged that because she filed a complaint with the EEOC, Faella denied her FMLA leave and harassed her "any way he [could]."  (*Id*.)  She also reiterated her request for compensation, asked not to have to work weekends ever again, asked that Faella be required to take anger management classes, and asked to be placed in charge of a level 20 or 21 post office of her choice.  (*Id*.)

In connection with the EEOC proceedings, an EEO investigator found that from December 22, 2008 to April 9, 2010, other male and female postmasters in the Philadelphia Metropolitan District worked a similar number of Saturdays as Vorn, and it was actually a male postmaster who worked the most Saturdays in that timeframe.  (Def. Ex. 11.)

Vorn filed this lawsuit on December 12, 2012.  (ECF No. 1.)  The case was placed in civil suspense for almost four years, pending resolution of her related EEO proceeding.  (ECF

Nos. 3-6.)  On November 29, 2016, Vorn filed an Amended Complaint, alleging sex

discrimination (Count I) and retaliation (Count II), in violation of Title VII.  (ECF No. 7.)

Meanwhile, Vorn became postmaster of the Hatboro Post Office in April 2013, which was a

lateral transfer from Gladwyne.  (Plaintiff Dep. 60-61.)[3]  Because the Hatboro Post Office

subsequently grew in size, Vorn was promoted.  (*Id*.)

## II.     DISCUSSION

### A.      Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  When making this determination, we must weigh all facts in the light most

favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving

party.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  "For its part, '[t]he

non-moving party must oppose the motion and, in doing so, may not rest upon the mere

allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not

suffice.'"  *Id*. at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d

Cir. 2014)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'"  *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  "Conversely, 'where a non-moving party fails sufficiently to

establish the existence of an essential element of its case on which it bears the burden of proof at

trial, there is not a genuine dispute with respect to a material fact and thus the moving party is

---

[3]        When Vorn advised Faella of her transfer to Hatboro, he was congratulatory.  (Pl. Ex. 9.)

entitled to judgment as a matter of law.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

### B.    Vorn has failed to establish a *prima facie* case of sex discrimination

To prevail on a claim of sex discrimination under Title VII, a claimant must satisfy the three-step burden-shifting inquiry laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the plaintiff must establish a *prima facie* case of discrimination.  This requires the plaintiff to show that "'1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.'"  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).  "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

However, "[i]f a plaintiff establishes a prima facie case of discrimination, then an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *Makky*, 541 F.3d at 214 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993)).  "If the defendant does so, the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination."  *Id*. (citing *St. Mary's Honor*, 509 U.S. at 507-08).

Defendant does not contest that Vorn is a member of a protected class and is qualified for her position.  We therefore focus on the third and fourth prongs of the first step of the *McDonnell Douglas* framework.  An adverse employment action is "'an action by an employer that is

7

serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Komis v. Sec'y of United States Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (quoting *Jones v. Southeastern Pennsylvania Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)). Such actions are "'not limited to 'economic' or 'tangible' discrimination'" and include "'more than 'terms' and 'conditions' in the narrow contractual sense.'" *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). On the other hand, Title VII does "not provide relief for unpleasantness that may be encountered in the work place." *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014).

With regard to the fourth prong of the *prima facie* case, an inference of discrimination can "be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar [] discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting [sex-based] animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)); *see also Ramirez v. Palmer Twp.*, 292 F. Supp. 3d 609, 624-25 (E.D. Pa. 2018) ("Though 'crude and unprofessional' comments may be offensive, they are insufficient, without more, to create an inference of discrimination.") (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999)).

A review of the record fails to reveal any evidence or examples of an adverse employment action against Vorn. We note that during the relevant timeframe, Vorn's work schedule may not have been optimal, but a less-than-desirable work schedule does not constitute adverse employment action. This is especially true when Vorn and other similarly situated employees had been struggling with that issue for several years. *See Sims v. District of Columbia*, 33 F. Supp. 3d 1, 7 (D.D.C. 2014) (holding that a police officer's "allegation that

temporary detail assignments 'negatively affected her work schedule' unquestionably falls into [the] category of non-actionable 'dissatisfaction'").  In addition, we acknowledge that Faella's emails were not particularly friendly.  However, they clearly did not alter the terms and conditions of Vorn's employment or otherwise rise to the level of an adverse employment action.

We also cannot infer any discrimination based on the record before us.  Vorn asserts in her Declaration that Faella assisted male postmasters in finding coverage for their days off.  (Vorn Decl. ¶ 7.)  However, Vorn provides no specific details about these instances, such as the names of the male employees and the relevant dates and times.  Vorn cannot create a genuine dispute of material fact with unsupported, conclusory allegations.  Moreover, Faella testified that he did occasionally assist Vorn with finding coverage, even though it was not his responsibility to do so.  (Faella Dep. 85-86.)  Finally, Vorn alleges that in 2009, male postmasters in her district were not forced to work ten-hour days or on Saturdays. (Vorn Decl. ¶ 8.)  This allegation, too, is not supported by any additional evidence.  Moreover, it is belied by the EEO investigatory records showing that at least three males in the Philadelphia Metropolitan District worked multiple Saturdays in that timeframe.  Furthermore, from December 22, 2008 to April 9, 2010, it was a male who worked the most Saturdays of any similarly situated postmaster in the area.  (Def. Ex. 11.)

Vorn has failed to raise a genuine issue of material fact with respect to the last two elements of a *prima facie* case of sex discrimination.  Because Vorn has failed to establish a *prima facie* case of discrimination, we need not consider the remaining steps of the *McDonnell Douglas* framework.  Summary judgment will be granted in favor of Defendant on Count I of the Amended Complaint.

### C.      Vorn has failed to establish a *prima facie* case of retaliation

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995)). "If the employee establishes this *prima facie* case of retaliation … 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id*. at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id*.

Defendant acknowledges that Vorn engaged in a protected activity when she filed her complaints with the EEOC. Accordingly, we address only the second two elements of the *prima facie* case. With regard to the second element, "[u]nlike the antidiscrimination provision [of Title VII], the antiretaliation provision is not limited to employer action that affects the terms and conditions of a claimant's employment." *Komis*, 918 F.3d at 293. However, it is limited in that it only protects employees "from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). To establish an adverse employment action in the context of a retaliation claim, a plaintiff "must show 'that a reasonable employee would have found the challenged action materially adverse, which in this context

10

means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Komis*, 918 F.3d at 293 (quoting *White*, 548 U.S. at 68).

With regard to the causation element, "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  A plaintiff "can meet this burden by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (internal citations and quotations omitted).  These, however "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).  In addition, to prove causation, the plaintiff must show that her employer or "decision maker had knowledge of the protected activity." *Moore*, 461 F.3d at 351 (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)).

Timing is critical in a retaliation case.  However, Vorn has not given the Court a clear timeline of events.  Weighing all facts in the light most favorable to Vorn, we assume that Defendant was made aware of Vorn's protected activity the day she filed her first EEO complaint, on January 25, 2010.  The next step is to determine what allegedly adverse employment actions occurred after that date.  Although Vorn does not give us many specific dates, she contends generally that the following instances of adverse employment activity occurred after she filed her initial complaint with the EEOC:

- Faella denied Vorn the use of FMLA leave to take care of her ailing mother;

- Faella "continued to schedule Plaintiff to work on her days off on Saturdays, without providing Plaintiff with coverage";

- Faella "consistently denied Plaintiff over-time pay for working 10-hour days and on her off days and vacation days";

- Faella "forced and required Plaintiff to use her personal vehicle" for street supervision;

- Faella threatened to reassign and demote Vorn because she refused to use her personal vehicle for street supervision;

- Faella denied Vorn the use of a postal vehicle to perform her duties; and

- Faella "subjected Plaintiff to retaliatory intimidation, embarrassment, mental abuse and verbal attack."

(Pl. Br. at 13-14, ECF No. 26.)  Acknowledging that some of these activities began before she filed her EEO complaints, Vorn suggests that Faella's conduct became more antagonistic after she filed the complaints.  She also asserts, correctly, that being subject to more vigorous enforcement of work policies after engaging in a protected activity can constitute adverse employment action.  *See Moore*, 461 F.3d at 352.

With regard to Vorn's first contention, that Faella denied her the use of FMLA leave to take care of her mother, Vorn requested the leave in November 2010, which was almost a year after she filed her EEO complaints.  (Pl. Ex. 29.)  Upon review of the record and the summary judgment papers, it appears that Vorn's leave request was actually approved (*see* Pl. Ex. 30; Vorn Decl. ¶ 28), and that Vorn's real grievance is that "Faella refused to obtain coverage" for her, thus making it impossible for her to use the leave.  (*See* Vorn Decl. ¶ 28.)  Vorn cites to a January 3, 2011 email chain in which she asked Faella to find her coverage for certain days on which she needed to take her mother to medical appointments.  (Pl. Ex. 30.)  In response, Faella asked Vorn who she had been relying on for coverage and if she had asked those people to cover

12

her.  (*Id*.)  He also explained that "[a]s the postmaster, [she] need[ed] to identify coverage."  (*Id*.)  Vorn wrote in a responsive email that "Mark [has] been providing coverage for me for vacation and FMLA sick leave for my mother.  Mark has been great in providing coverage."  (*Id*.)[4]  Vorn's emails show that she also asked several other individuals to help her find coverage.  (Pl. Ex. 31.)

Even if we assume that Faella's conduct in this instance constituted an adverse employment action, Vorn has failed to establish that his conduct was causally related to her EEO complaints.  First, it was Vorn who requested the FMLA leave and approached Faella about finding coverage.  Therefore, any suggestion that Faella went out of his way to antagonize Vorn must be met with some skepticism.  Second, because this FMLA incident was isolated, it is difficult to consider it part of a "pattern of antagonism."  *See Carvalho-Grevious*, 851 F.3d at 260.  Similarly, the timing of this incident, almost a year after Vorn filed her EEO complaints, is not indicative of a "temporal proximity unusually suggestive of retaliatory motive."  *See id*. Finally, even upon a generous review of the whole record, there is no indication—aside from Vorn's own characterization of events—that Faella's handling of the FMLA issue had anything to do with the EEO complaints.  Without any facts to support Vorn's allegation that Faella prevented her from using FMLA leave in retaliation for filing those complaints, Vorn cannot meet her burden of establishing a *prima facie* retaliation claim on this basis.

Vorn's second assertion in support of her retaliation claim is that after she filed her EEO complaints, Faella "continued" to require her to work Saturdays and refused to provide her coverage.  (Pl. Br. at 13, ECF No. 26.)  Vorn cannot establish a *prima facie* case of retaliation on this basis.  First, as we discussed above, Vorn and her colleagues had been struggling with their

---

[4]      Based on the email chain, it appears that "Mark" was a supervisor or postmaster from the Clifton Heights Post Office.

work schedules for years.  Vorn has not come forward with any concrete or credible evidence suggesting that she was treated differently than anyone else in that regard.  The staffing shortage was just a reality of the situation at the time.  Vorn knew that even before she accepted the position at Gladwyne.  Accordingly, Vorn has failed to establish an adverse employment action on these grounds.  Moreover, we note that Vorn admits that the staffing situation began before she filed the EEO complaints and "continued" afterward (*see id*.), thus destroying any causation argument.  The consistency in Vorn's scheduling complaints, both before and after she filed her EEO complaints, is indicative of business as usual, not retaliation.

Vorn next asserts that Faella denied her overtime pay.  Vorn does not provide any earnings statements or records, much less records showing that Faella began denying her overtime pay after she filed her EEO complaints.  The only support for her claim is her own word.  We will not permit this claim to go to a jury solely on the basis of self-serving, conclusory allegations, especially when Vorn should have been able to support the claim with routine employment records.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (holding that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment").

Vorn's fourth, fifth and sixth charges are all related:  Faella allegedly denied her the use of a postal vehicle to perform her duties, forced her to use her own personal vehicle for street supervision, and threatened to reassign and demote her because she refused to use her personal vehicle for street supervision.  We address these claims together.  Vorn has come forward with evidence showing that the USPS could not require her to use her own personal vehicle.  (Pl. Ex. 13.)[5]   She has not, however, come forward with credible evidence showing that she was forced

---

[5]      According to Vorn, Faella stated at his deposition that "postmasters *were required* to use a personal vehicle for postal service duties, such as street supervision and accident investigation

to use her own vehicle.  To the contrary, Faella offered Vorn suggestions for finding a postal vehicle to use.  (Pl. Ex. 15.)  The record also shows that there were some, presumably larger postal vehicles or trucks available, but Vorn did not feel comfortable using them.  (Pl. Exs. 14-15, 26.)  The record indicates that Vorn could have participated in certain training to learn how to use these vehicles, but she did not.  (Pl. Ex. 14.)  Vorn also could have ridden along with other postal employees in a jump seat, but she chose not to.  (Faella Dep. 90-91; Maher Dep. 52-53; Vorn Decl. ¶ 17.)[6]

Pursuant to a generous reading of the record, one could theoretically infer that although there were government vehicles available for Vorn's use, Faella knew that Vorn could not actually use them.  Theoretically, perhaps Faella purposefully made this situation worse for Vorn so he could report her to management and ask for her to be reassigned.  (*See* Pl. Ex. 14.)  Even if we were to draw such favorable inferences from the record, Vorn was never actually

_____

if a postal vehicle was not available." (Pl. Br. at 19) (emphasis in original).  This assertion ignores the jump seat option (*see* Faella Dep. 90-91) and mischaracterizes Faella's testimony.  In response to counsel's question, "Were the postmasters required to use a personal vehicle for postal service duties?", Faella answered, "Yes…. But there's also a reimbursement policy and there's also a policy in effect that they don't have to use their [privately owned vehicle].  They could use a postal vehicle." (Faella Dep. 39-40.)  Later at his deposition, Faella also clarified that postmasters were not required to use their own vehicles for street observation.  (*See id*. at 90-91.).  Faella did not address vehicle availability, other than to say that he "knew [Vorn] had [an] opportunity to get a government vehicle."  (*Id*. at 42.)

[6]   We note an inconsistency in the record.  According to a fair reading of the evidence, there were some government vehicles available for Vorn's use.  (*See* Pl. Exs. 14, 26.)  Another fair interpretation of the evidence, however, is that there were no available government vehicles, or that there were government vehicles available, but Faella prohibited Vorn from using them.  (*See* Plaintiff Dep. 269-70; Pl. Exs. 14-15; Pl. Br. at 5 (referring to postal vehicles "sitting idle in the parking lot in the District Office").)  Still another reasonable interpretation of the record is that there were no government-issued Ford Focuses or other standard vehicles available for Vorn's use (Plaintiff Dep. 269-70 ("I asked for a car, a Ford Focus, and I couldn't get one.")), but there were delivery vehicles available, and Vorn simply chose not to use them.  (Pl. Exs. 14-15, 26; *see also* March 13, 2018 Dep. of Robert Weiser 27, Def. Ex. 15 (explaining that only postmasters at level 24 offices or higher were provided with staff vehicles).)

involuntarily reassigned or demoted.  (Pl. Dep. 275-76.)  Moreover, Faella did not recommend

her reassignment to management until February 2011, over a year after Vorn filed her first EEO

complaint.  (*See* Pl. Ex. 14.).  Ultimately, there is no evidence indicating that Faella used Vorn's

street observation duties as a vehicle for retaliation.

       Finally, Vorn claims that Faella intimidated, embarrassed, mentally abused, and verbally

attacked her.  These are grave allegations for which we would expect Vorn to come forward with

significant evidentiary support.  She has not.  Instead, she relies exclusively on her own

conclusory allegations, which fail to prove any specific instances of harassment.  Vorn offers

some emails between her and Faella in support of her claims, but the emails show, at most, that

Faella could be terse or unpleasant on occasion.  That does not rise to the level of adverse

employment action.  Even if it did, there is no causal relationship between Vorn's protected

activities and Faella's gruffness.[7]

       Accordingly, Vorn has failed to establish a *prima facie* case of retaliation.  Summary

judgment will be granted in Defendant's favor on Count II of the Amended Complaint.

## III.   CONCLUSION

       For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted

and the Amended Complaint will be dismissed.

       An appropriate order follows.

**BY THE COURT:**

**/s/ R. Barclay Surrick**
**R. BARCLAY SURRICK, J.**

---

[7]     Vorn also alleges that she was denied upward mobility to a larger post office.  (*See* Vorn
Decl. ¶ 27; Pl. Ex. 28.)  However, she provides no evidence in support of this allegation, and she
has since been promoted.  (Plaintiff Dep. 60-61.)